IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

NICOLE D'AMBROSIO,

            Plaintiff,

    v.

CRESTHAVEN NURSING &
REHABILITATION CENTER,

            Defendant.

HONORABLE JEROME B. SIMANDLE

Civil No. 14-06541 (JBS/KMW)

**OPINION**

APPEARANCES:

W. Charles Sipio
KOLMAN ELY PC
414 Hulmeville Avenue
Penndel, PA 19047
    Attorney for the Plaintiff

Stephanie E. Farrell
COOPER LEVENSON, P.A.
1125 Atlantic Avenue
3rd Floor
Atlantic City, NJ 08401
    Attorney for Defendant

**SIMANDLE**, Chief Judge:

I.    **INTRODUCTION**

    Plaintiff Nicole D'Ambrosio ("Plaintiff") filed this

lawsuit against her employer Crest Haven Nursing &

Rehabilitation Center ("Defendant"). Plaintiff has brought suit

alleging race discrimination and retaliation under Title VII of

the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 et.

seq. ("Title VII"), as well as under 42 U.S.C § 1981, § 1983,

and the New Jersey Law Against Discrimination ("NJLAD"). Plaintiff has also alleged interference and retaliation claims under the Family Medical Leave Act ("FMLA") and the New Jersey Family Leave Act ("NJFLA"). She alleges that her supervisors at Crest Haven discriminated against her and interfered with her FMLA rights because she is African American and retaliated against her for filing an initial complaint with the Equal Employment Opportunity Commission ("EEOC") and for taking medical leave.

Presently before the Court is Defendant's motion for summary judgment on all claims pursuant to Fed. R. Civ. P. 56 [Docket Item No. 31], arguing that it had a legitimate, non-discriminatory reason for each of its employment decisions. Plaintiff opposes the motion [Docket Item No. 34], to which Defendant has submitted a reply. [Docket Item No. 37.]  The motion is decided without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons set forth herein, the Court, will grant Defendant's motion for summary judgment on all of Plaintiff's claims.

## II.  BACKGROUND

This Court begins with an examination of the factual record in this action, beginning with Defendant's Statement of Material Facts Not in Dispute ("SMF").

Plaintiff was hired by Cape May County as an Institutional Attendant for Crest Haven Nursing and Rehabilitation Center ("CHNRC") on June 29, 1993. (SMF ¶ 1.) CHNRC is an entity of the County of Cape May, New Jersey and is a 180 person long-term care facility, employing approximately 200 full-time employees. (SMF ¶ 2.) Throughout the time of Plaintiff's employment, including through the present, Defendant has had in place official workplace policies prohibiting discrimination and retaliation as well as reporting procedures for employees who believed they were being subjected to discrimination or who witnessed it. (SMF ¶ 109; Def. Ex. T, County Anti-discrimination and Anti-retaliation policies.) At all points during her employment and continuing in the present, Plaintiff has held the Civil Service Title of Senior Clerk Typist. (SMF ¶ 3.) Plaintiff is still currently employed with CHRNC as Scheduling Coordinator, a position she has held since April 2014. (SMF ¶ 5-6.) Despite maintaining the same Civil Service title, pay and benefits, Plaintiff's job responsibilities within CHNRC have shifted over the years. (SMF ¶ 7-10; 22; 24; 28.) In connection with Plaintiff's instant claims, the Court will examine Plaintiff's (1) transition from Admissions Director to Admissions Clerk; (2) reassignment from Admissions Clerk to Ward

Clerk; and (3) denial from Scheduling Coordinator and Financial Director positions.

1. *Admissions Director to Admissions Clerk – May 2012.*

In May 2012, Plaintiff was removed from her supervisory role as Admissions Director and placed in the role of Admissions clerk. (D'Ambrosio Dep. 83:1-4.) On or around April 27, 2012, a heated telephone conversation between Plaintiff and Lisa McNulla, CHNRC Assistant Administrator and one of Plaintiff's supervisors, led to the subsequent removal of Plaintiff's supervisory duties. (Def. Ex. E, Statement of Lisa McNulla.) In that conversation, which was witnessed by Administrator and other supervisor Linda Thornton who was in the car with McNulla, Plaintiff expressed frustration with her work in the Admissions Department and informed Ms. McNulla that she would be requesting a "stress leave" from the Union. (SMF ¶ 18; Def. Ex. D, Linda Thornton's Summary of Meeting Notes dated 5/2/2012.) Ms. McNulla perceived that Plaintiff "was very short and extremely upset" and had been insubordinate for hanging up on her before the end of the call. (See Def. Ex. E, Statement of Lisa McNulla dated 4/27/12; Def. Ex. D.) As a result of the foregoing incident, a meeting was held on May 2, 2012, between Plaintiff, Ms. McNulla, Ms. Thornton, and Union Vice President Woody Lewis, where Plaintiff and her supervisors discussed their respective

concerns with Plaintiff's performance as Admissions Director. (Def. Ex. D, Linda Thornton's Summary of Meeting Notes dated 5/2/2012.) Ms. Thornton noted that she and Ms. McNulla felt that in regards to the April 27 phone call, Plaintiff "fell apart" and they had concerns about Plaintiff expressing to them that she felt her supervisory role was "overwhelming" since "Lisa [McNulla] has trained and guided her for over 5 years." (Id.) On May 7, 2012 Ms. Thornton sent a memo to Plaintiff informing her that as of May 9, 2012 Plaintiff's "job duties in Admissions will no longer include supervising the Admissions Staff." (Def. Ex. C; SMF 18-19.) Plaintiff was instructed that she would continue to perform the required clerical duties for the Admissions Department. (SMF ¶ 20.) Plaintiff retained her Civil Service Title of Senior Clerk Typist, and there was no change in her compensation or benefits. (SMF ¶ 22; D'Ambrosio Dep. 88:7-22; 115:12-23; 181:1-22; 187:24-188:22.) Plaintiff asked the union to pursue a grievance regarding Plaintiff's perceived "demotion," but the Union did not pursue the matter, informing her that the change in her job responsibilities without loss in pay was not considered a demotion. (SMF ¶ 19; D'Ambrosio Dep. 48:6-15; 138:8-22; 51:4-8.)

2. *External Case Manager to Ward Clerk – December 2012*

Plaintiff claims while she was working as Admissions Clerk she performed a dual role and also acted as an External Case Manager ("ECM"). (SMF ¶ 9, 24.) The role of the ECM at the time Plaintiff held the position was mainly off-site marketing to local physicians and hospitals in order to increase the number of patients at CHNRC. (D'Ambrosio Dep. 84:16-85:23.) On or around September 19, 2012, Plaintiff was informed by Ms. Thornton and Ms. McNulla that they were posting the ECM position because they wanted a person with more clinical experience to resume the job duties of ECM. (SMF ¶ 26; D'Ambrosio Dep. 148:3-25.) Ms. Thornton and Iris Drackett, the Director of Nurses at that time, made the decision to modify the job qualifications to require a Licensed Practical Nurse ("LPN") to fill the position because they felt the person admitting residents to a nursing home, who often had to deal with medical questions and medication issues, should have medical knowledge and training. (SMF ¶ 25; Drackett Dep. 31:4-32:10. See also Def. Ex. H, Linda Thornton email dated 11/27/13; Def. Ex. I, Revised Job Description for ECM position.) On or about September 26, 2012, Plaintiff was approved to go out on medical leave for three months. (D'Ambrosio Dep. 149:4-7.)

6

According to Plaintiff, on December 18, 2012, right before she returned from medical leave, Plaintiff filled out an initial intake questionnaire with the EEOC alleging race discrimination. (D'Ambrosio Dep. 132-135, at Ex. CMC-3.) Two days later, Plaintiff returned to CHRNC from medical leave. (Id. at Ex. P-7.) At this time, Ms. McNulla and Ms. Thornton informed Plaintiff she was being assigned as Ward Clerk because there was a vacancy in that position due to another employee, Janella Gutner, going out on medical leave. (SMF ¶ 29; D'Ambrosio Dep. 117.) During this time, CHNRC was experiencing a hiring freeze as a result of County budgeting mandates, so CHNRC had to make do with only the employees they had. (SMF ¶ 4; D'Ambrosio Dep. 165:3-14.) As a result there were a number of staff changes and employees were often reassigned or asked to fill multiple roles. (SMF ¶ 21; Drackett Dep. 24: 13-20.) CHNRC was further subjected to Department of Health requirements concerning staffing at nursing home facilities and was therefore required to have a certain number of employees in certain positions. (SMF ¶ 38.) The Ward Clerk position was one of these mandatory staffing positions and needed to be filled. (SMF ¶ 39; D'Ambrosio Dep. 128:3-11.) Nicole Hebron had replaced Plaintiff in the Admissions Department during Plaintiff's medical leave, and

because she was kept in that position upon Plaintiff's return, there were no vacant positions in the Admissions Department.

When informed that she was being assigned to Ward Clerk, Plaintiff never voiced any objection to her supervisors, and her salary, benefits, and Civil Service Title as "Senior Clerk Typist" remained the same. (SMF ¶ 32-34; D'Ambrosio Dep. 88:2-9, 14-21; 91:16-22; 115:8-11.) As Ward Clerk, she also had the same shifts and days off and worked in the same building as she did while working in Admissions. (SMF ¶ 35-36; D'Ambrosio Dep. 91:23-92:3; 92:22-93:11; 115:12-116:2.) Around this same time, Plaintiff filed a grievance with the CHNRC union. (D'Ambrosio Dep. 42:18-43:23.) The union did not pursue the grievance in which Plaintiff alleged she had been demoted, because the union representatives told her that the changes in her duties from Admissions Clerk to Ward Clerk did not constitute a demotion since she did not lose any salary or benefits. (D'Ambrosio Dep. 138:8-22.) The union did not investigate her grievance or pursue a demand for arbitration on her behalf. (SMF ¶ 121; D'Ambrosio Dep. 48:16-19; 51:4-8.)

3. *Denial of Scheduling and Finance Positions – January 2013*

During the months Plaintiff was out on medical leave, Samantha Shelton, an employee who had been working in the Food Services department, began temporarily filling in as Scheduling

8

Coordinator while the normal coordinator, Kim Vo, was out on leave. (SMF ¶ 62; Hebron Dep. 42:1-5; Pl. Ex. D, at Ex. P-7.) Ms. Vo eventually resigned and the scheduling position was officially posted on January 7, 2013. (SMF ¶ 44; Def. Ex. M, Background Information Regarding the Scheduling Position prepared by Ms. Drackett.) This same day Defendant received the first Notice of Charge of Discrimination (Notice of Charge No. 530-2013-00842 ("Charge 842")) from the EEOC, which indicated that the alleged discrimination was based on "race," that the issues involved were "demotion" and "terms/conditions" of employment and that the timeframe at issue was "5/9/12 to 9/18/12." (SMF ¶52; Def. Ex. N, EEOC Notice of Charge No. 842.) The Notice of Charge indicated that a perfected charge would be sent to Defendant once it was received from the charging party.[1] (Id.)

One week later, on January 14, 2013, Plaintiff submitted a letter requesting an interview for the scheduling position, and on January 16, Ms. Shelton requested the same. (SMF ¶ 45; Drackett Dep. 15:21-16:9; Pl. Ex. D, at Ex. P-7.) On January 18,

---

[1]As of October 21, 2013 Plaintiff still had not provided the EEOC with a signed perfected charge in relation to Charge No. 842. (SMF ¶ 54; Def. Ex. O, Correspondence from EEOC Investigator to County Counsel dated 10/21/12.) Plaintiff's perfected Charge of Discrimination was filed a year later, on October 21, 2013, and was received by Defendant on November 6, 2014. (SMF ¶ 55-56; Def. Ex. P, Plaintiff's Charge of Discrimination, CMC 439-440.)

Ms. Shelton and Plaintiff were separately interviewed for the Scheduling Position by Ms. Thornton and Ms. Drackett (SMF ¶ 46; D'Ambrosio Dep. 58:14-17; Pl. Ex. D, at Ex. P-7.) Ms. Drackett, in consultation with Ms. Thornton and Head of Human Resources Barabara Bakley-Marino, decided to hire Ms. Shelton for the position. (SMF ¶ 47, 49.) In her written notes on the reasons why she did not select Plaintiff for the position, Ms. Drackett wrote:

> (1)  [Plaintiff] asked only a few questions. The scheduler's position is multifaceted and very demanding. I personally felt that she should have been more questioning because she has been employed at Crest Haven for (twenty) 20 years and she should have been aware of how many schedulers have resigned or changed position due to stress.
> (2)  I am very much aware of how easily [Plaintiff] becomes stressed. I worked along with her when she was in the Admission Dept. She had a history and pattern of calling me often . . . oftentimes they were routine admissions and should not have needed my input. My assessment of her at the time was that she was unsure of herself.
> (3)  Although [Plaintiff] held an undergraduate degree and was pending her Master's Degree the [scheduling] position did not lend itself to the advanced degree. The job required the person to have basic computer skill, to work well with others, to be organized and to be able to multi-task and work in a fast paced atmosphere.

(SMF ¶50, Def. Ex. M, Drackett Memo on hiring decisions dated April 29, 2014.) [2]

---

[2] Plaintiff argues that this memo (Def. Ex. L.) raises a genuine dispute over whether Defendant had a legitimate rationale for selecting Ms. Shelton over Plaintiff for the scheduling position because this memo is dated April *2014*, over a year after the decision was made. While this fact could infer a post-hoc rationalization by Ms. Drackett, as Plaintiff asserts, this fact

In January, 2013 an opening for Financial Director[3] also opened up, and Plaintiff submitted a letter of interest for the position to Ms. Thornton on January 16, 2013. (SMF ¶ 89; Def. Ex. R, Plaintiff's Correspondence to Ms. Thornton dated 01/16/13.) Ms. Thornton emailed Plaintiff in response, informing her that she intended to hire an accountant to take over the financial duties of the former Director of Finance. (SMF ¶ 90; Def. Ex. S, Thornton E-mail to Plaintiff dated 01/16/13.) Plaintiff has never worked in finance before, nor does she have any financial accounting experience. (D'Ambrosio Dep. 53:21-22; 54:1-3.) Plaintiff does have a Master's in Management, but she did not yet hold this degree when she applied for the position. (Id. at 52:5.) Further, she has never been responsible for maintaining a balance sheet or financial books or records. (Id. at 55:7-13, 140:6-141:10.) The position was ultimately filled by Bridgette O'Brien, a County employee for over 24 years. (SMF ¶ 98, D'Ambrosio Dep. 120:23-121:2.)

---

is not material. As discussed below, given the myriad of undisputed facts supporting Defendant's legitimate, non-discriminatory rationale for hiring Ms. Shelton, the fact that the Ms. Drackett's memo may have been made a year after-the-fact does not alone raise a genuine issue of material dispute as to whether Defendant's proffered reason for hiring Ms. Shelton was racially motivated pretext.

[3] Both parties interchangeably refer to this position as "financial director," "financial manager" and "financial position." The Court will refer to this position as the "Financial Director" position.

Plaintiff filed her second Charge of Discrimination (Charge No. 530-2013-3150 ("Charge 3150")) on September 9, 2013 alleging that the failure to hire her for the Scheduling Coordinator or Financial Director position was an act of retaliation in response to Plaintiff's filing the first charge, Charge 842, with the EEOC in December 2012. (SMF ¶ 57, Def. Ex. Q, Notice of charge and Charge of Discrimination No. 3150.) Defendant received this second charge, Charge 3150, on November 6, 2013. Ms. Drackett stated that she learned about the EEOC charges from Ms. Thornton sometime between April and October 2015. (Drackett Dep. 27:2-19.) Plaintiff filed her perfected charge of discrimination in connection to Charge 842 on October 21, 2013, which Defendant received two weeks later. (SMF ¶ 55-56; Def. Ex. P, Notice of Charge and Plaintiff's Charge of Discrimination.)

The EEOC issued and mailed to Plaintiff a Notice of Right to Sue for both Charge 842 and Charge 3150 on October 17, 2014. Plaintiff filed this complaint on October 22, 2014 [Docket Item No. 1.] and Defendant moved for summary judgment on December 16, 2015, to which the Court now turns. [Docket Item No. 31.]

## III. STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

12

affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

    In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder, and thus at the summary judgment stage credibility issues should be resolved against the moving party. Big Apple BMW v, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992); Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, "[t]he mere existence of a scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 252. In the face of such evidence, summary judgment is still appropriate

"[w]here the record . . . could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies under Title VII

As exhaustion is a prerequisite to bringing a Title VII suit, the Court will first address this threshold issue. A plaintiff bringing an employment discrimination claim under Title VII must comply with the procedural requirements set forth in 42 U.S.C. § 2000e-5. Before filing a lawsuit, a plaintiff must exhaust her administrative remedies by first filing a timely discrimination charge with the EEOC. <u>Id.</u> at §§ 2000e-5(b), (e)(1), (f)(1). A plaintiff is required to raise all Title VII claims with the EEOC prior to bringing an action in federal court. <u>Webb v. City of Philadelphia</u>, 562 F.3d 256, 262 (3d Cir. 2009). This requirement is necessary "to put the EEOC on notice of the claims," affording "it the opportunity to settle disputes" so as to avoid "unnecessary action in court." <u>Id.</u> The Third Circuit has held that a plaintiff "is not permitted to bypass [this] administrative process." <u>Id.</u> (quotations omitted). The ensuing Title VII suit is then limited to claims that are within the scope of the initial administrative charge. <u>Antol v.</u>

14

Perry, 82 F.3d 1291, 1296 (3d Cir.1996). The Court finds that
all of Plaintiff's claims were timely filed and properly
exhausted and thus will be determined on the merits.

     *1. Charge 842: Racially Motivated Demotion*

     With regards to Charge No. 530-2013-842 ("Charge 842"),
Defendant asserts that Plaintiff only exhausted administrative
remedies as to her claim of disparate treatment in connection
with her return to work after medical leave because she did not
formally file her charge of discrimination until October 21,
2013. (Def. Br. 8.) Therefore, Defendant avers, Plaintiff's
claims of demotion from Admission Supervisor in May 2012 is time
barred because of the 300 day statute of limitations laid out in
42 U.S.C. 2000e-5(1). (Id. 8-9.) Plaintiff argues that all her
claims related to Charge 842 are within the EEOC's 300 day
limitation because she initially filed an intake questionnaire
on December 18, 2012. (Pl. Ex. A, at Ex-CMC-3 at p. 41, EEOC
Intake Questionnaire; D'Ambrosio Dep. 132:3-25.) The central
question for this Court is whether Plaintiff's timely-filed
intake questionnaire constitutes a charge of discrimination,
thus making all of Plaintiff's claims relating to Charge 842
timely. The Court finds that it does.

     Plaintiff's filing of the initial Intake Questionnaire
counts as a charge of discrimination because it generated a

response from the EEOC and a subsequent notification of the charges to Defendant. While a timely-filed intake questionnaire is not a per se charge of discrimination, when the questionnaire fulfills the core purpose of an EEOC charge by informing employers that they are prospective defendants in a discrimination case, the questionnaire will be deemed the formal charge. See 42 U.S.C. § 2000e-5(b) (requiring the Commission to serve notice of the charge on the employer against whom it is made); see also Barzanty v. Verizon PA, Inc., 361 F. App'x 411, 415 (3d Cir. 2010) (" . . . the central purpose of a charge is to put the employer on notice of the allegations."); Occidental Life Ins. Co. of Cal v. EEOC, 432 U.S. 355, 359-60 (1977) (stating the same); Hightower v. Roman, Inc., 190 F. Supp. 2d 740, 747 (D.N.J. 2000) ("the purpose of requiring an aggrieved party to first resort to the EEOC is twofold: to give notice to the charged party and provide an avenue for voluntary compliance without resort to litigation.") (emphasis added). The Court finds that in the instant case, Plaintiff's filing of the intake questionnaire with the EEOC was enough to put Defendant on notice and fulfill the central purpose of having an EEOC charge. Indeed, Defendant received from the EEOC a Notice of Charge of Discrimination on January 7, 2013, which provided a sufficiently detailed statement of Plaintiff's allegations, namely, that the

16

allegations involved race discrimination in connection with demotion and conditions of employment occurring between May and September 2012. (See Def. Ex. N.)

Additionally, in filing the Intake Questionnaire, Plaintiff incited action on the part of the EEOC, suggesting the EEOC itself believed the questionnaire to be a charge. While Defendant is correct that the EEOC's belief as to the timeliness of a charge is not determinative, Kocian v. Getty Refining & Marketing Co., 707 F.3d 748, 754 n. 9 (3d Cir. 1983), it is still informative since a court generally gives deference to "matters of detail related to [an agency's] administration" of a statute. Barnhart v. Walton, 535 U.S. 212, 225 (2002); see also Federal Exp. Corp. v. Holowecki, 552 U.S. 389, 397 (2008) (asserting that "[the EEOC] is entitled to further deference when it adopts a reasonable interpretation of regulations it has put in force.") Within two weeks of receiving Plaintiff's complaint, the EEOC sent the Notice of Charge of Discrimination to Defendant, indicating that the agency construed the Plaintiff's initial Intake as a request for the EEOC to act. (Def. Ex. N; D'Ambrosio Dep., at 132:3-25.) Additionally, this notice also included the EEOC charge number and statement acknowledging a "perfected charge will be mailed to you." (Id.) The EEOC's text of the intake questionnaire itself notes "this

questionnaire may serve as a charge if it meets the elements of a charge." (Pl. Ex. A, at Ex-CMC-3 at p. 41, EEOC Intake Questionnaire.) The EEOC's immediate notice to Defendant on a form that included a charge number and acknowledgment of a soon to follow "perfected charge" indicates that the agency recognized Plaintiff's initial Intake Questionnaire as a charge. See Walker-Robinson v. J.P. Morgan Chase Bank, N.A., No. 11-4913, 2012 WL 3079179, at *6 (D.N.J. July 27, 2012) (finding that an intake questionnaire constituted a charge under Title VII when the EEOC treated it as a charge by assigning a charge number and notifying the employer that a charge had been filed against it). This Court is persuaded by the prompt action taken by the EEOC in response to receiving Plaintiff's intake questionnaire that the agency itself recognized the intake questionnaire as an official charge.

It is important to recognize that Title VII establishes a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process. Therefore, "the system must be accessible to individuals who have no detailed knowledge of the relevant statutory mechanisms and agency processes." Federal Express v. Holowecki, 552 U.S. 289, 403 (2008); see also Love v. Pullman Co., 404 U.S. 522, 527 (1972) ("[T]echnicalities are particularly inappropriate in a statutory scheme in which

laymen, unassisted by trained lawyers, initiate the process.") There must be some level of malleability in determining whether a plaintiff properly filed a discrimination charge. Thus, in recognition of this principle and in giving due deference to the EEOC as the charging agency, this Court construes the initial Intake Questionnaire as a charge and finds all of Plaintiff's claims in Charge 842, are within the EEOC's 300 days limitation and will be heard by this Court.

### 2. Charge 3150: Race Discrimination

In general, a plaintiff is required to first raise all Title VII claims with the EEOC prior to bringing an action in federal court. Webb v. City of Philadelphia, 562 F.3d 256, 262 (3d Cir. 2009). Defendant argues that because Plaintiff did not raise a claim of discrimination in connection in her charge of retaliation in Charge 3150, she cannot do so in the instant Title VII claim. (Def. MSJ at 4.) Plaintiff responds that her claim that she was racially discriminated against is based on the same acts as the retaliation claim, namely, her denial from the Scheduling Coordinator and Financial Director positions, and thus the two claims constitute the same charge and were properly exhausted. (Pl. Opp. at 9.) The Court agrees with Plaintiff.

Plaintiff's Title VII allegations of race discrimination in connection with Charge 3150 will not be dismissed because they

19

are encompassed by the same discrete acts and factual circumstances that make up the original EEOC charge of retaliation. The relevant test in determining whether a plaintiff has exhausted her administrative remedies, is "whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984) (per curiam); Hicks v. ABT Associates, 572 F.3d 960, 965-66 (3d Cir. 1978); Ostapowicz v. Johnson, 541 F.2d 394, 399 (3d Cir. 1976); see also Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) ("Requiring a new EEOC filing for each and every discriminatory act would not serve the purposes of the statutory scheme where the later discriminatory acts fell squarely within the scope of the earlier EEOC complaint or investigation.") A plaintiff's suit will not be barred for failure to exhaust administrative remedies if the "core grievances" in the Title VII suit filed and the earlier EEOC complaint are the same. See Waiters, 729 F.2d at 237 (holding that the plaintiff's suit was not barred for failure to exhaust administrative remedies because his Title VII suit alleging retaliatory firing shared the same core grievance as the earlier EEOC complaint charging retaliatory employment restrictions); Antol, 82 F.3d at 1291 (finding that an initial EEOC charge of

disability discrimination cannot fairly encompass a subsequent Title VII claim of gender discrimination).

While Plaintiff's initial claims under Charge 3150 only alleged unlawful retaliation, a reasonable investigation by the EEOC would have also encompassed examination of potential racial discrimination. Moreover, the Title VII charge of race discrimination is based on the same "core grievances," namely, the denial of Plaintiff for Scheduling Clerk and Finance Director in January 2013. The discrete acts, and therefore the players involved, that make up the initial retaliation charge are identical to those supporting the race discrimination allegations in Plaintiff's complaint. It is clear that the latter allegations would inevitably have been revealed through the EEOC's investigation of the retaliation charges. Finally, in determining the scope of the original charge it is important to keep in mind, and it bears repeating, that "[EEOC charges] are most often drafted by one who is not well versed in the art of legal description [and] accordingly, the scope of the original charge should be liberally construed." Hicks, 572 F. 2d at 965. The Court finds that Plaintiff's allegation of race discrimination in connection with Charge 3150 in her Title VII claim are within the scope of a reasonable investigation of the

EEOC charge for retaliation and therefore the claims will be heard by this Court.

**B. Count I: Title VII**

The Court now turns to the substantive analysis of Plaintiff's Title VII claims, where Plaintiff alleges the following: (1) the removal of her supervisory duties was an act of discrimination based on her race; (2) her reassignment to Ward Clerk after returning from FMLA leave was an act of discrimination and disparate treatment because of her race; (3) her denial from the Scheduling and Finance positions was an unlawful act of racial discrimination; and (4) her denial from the Scheduling and Finance position was an unlawful act of retaliation for her filing of Charge 842. Defendant moves for summary judgment on all of these claims. Each allegation will be examined separately below.

**1. Claims of Race Discrimination and Disparate Treatment**

Defendant argues that Plaintiff cannot pass the prima facie case for racial discrimination under Title VII because she has not suffered any adverse employment action. Defendant further asserts that regardless of whether Plaintiff can pass this threshold barrier, Defendant has proffered sufficient evidence showing nondiscriminatory and non-retaliatory motivations underlie each action taken against Plaintiff.

22

Title VII of the Civil Rights Act of 1965 makes it unlawful for an employer to

> (1)     fail or refuse to hire or to discharge any individual, or otherwise discrimination against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2)     to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

The Court's inquiry for the instant case is governed by the flexible burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1974). See Scheidemantle v. Slippery Rock State System of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) (applying McDonnell Douglas standard to Title VII discrimination claim concerning indirect evidence). To prevail on a claim of racial discrimination under Title VII, Plaintiff must first establish a prima facie case of racial discrimination by demonstrating that (1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances that gave rise to an inference of discrimination. Jones v. Sch. Dist. Of Philadelphia, 198 F.3d 403, 412 (3d Cir. 1999); Holmes v. Newark

Public Schools, No. 13-765, 2016 WL 3014404, at *7 (D.N.J May 25, 2016).

Regarding prong three of the test, the Supreme Court has defined an adverse employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus. V. Ellerth, 524 U.S. 742, 761 (1998); see Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (describing an adverse employment action "as an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.") (internal quotation marks omitted). In other words, "[i]f an employer's act substantially decreases an employer's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found. Holmes, 2016 WL 3014404, at *8 (quoting Durham Life Ins. Co. v. Eans, 166 F.3d 139, 152-53 (3d Cir. 1999).

Once a plaintiff establishes a prima facie case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its employment decisions. McDonnell Douglas, 411 U.S. at 802. If the employer offers some evidence of a legitimate, nondiscriminatory reason

24

then the burden shifts back to the plaintiff who "must point to some evidence, direct or circumstantial, from which a factfinder could either reasonably (1) disbelieve the employer's articulated legitimate reasons; or (2) believe than an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions. Nappi v. Holland Christian Home Ass'n, No. 11-2832, 2015 WL 5023007, at *7 (D.N.J. Aug. 21, 2015) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

Defendant argues that not one of the alleged acts of discrimination can move forward under Title VII because Plaintiff cannot establish that any of Plaintiff's change in job responsibilities qualified as tangible enough to constitute an adverse employment action. Defendant further asserts that irrespective of the question over Plaintiff's ability to satisfy a prima facie case of discrimination, summary judgment is appropriate because Plaintiff has not proffered any evidence to show that Defendant's legitimate, non-discriminatory rationale for its employment actions was a pretext for discriminatory animus. The Court will respectively examine each allegation of racial discrimination and disparate treatment herein.

*a. Demotion from Admissions Director*

With regards to the removal of her supervisory duties, Plaintiff has failed to satisfy a *prima facie* case for discrimination. Plaintiff has indeed presented sufficient evidence to create a material dispute as to whether she suffered an adverse employment action. It is undisputed that Plaintiff at all times retained her Civil Service Title of Senior Clerk Typist and experienced no change in compensation as a result of the removal of the supervision duties. (SMF ¶ 22.) Yet the removal of supervisory duties is more than just a different position, but an obviously inferior one, which constitutes an adverse employment action by Defendant. "While direct economic harm is probative, so too is conduct that substantially decreases one's earning potential or disrupts [Plaintiff's] working conditions." Swain v. City of Vineland, 457 F. App'x 107, 110 (3d Cir. 2012) (citing Durham Life Ins. Co. v. Evans, 166 F.3d 139, 153 (3d Cir. 1999)); see also de la Cruz v. New York City of Human Res. Admin. Dep't of Soc. Serv., 82 F.3d 16, 21 (2d Cir. 1996) (holding that proof of diminution in prestige and less opportunity for professional growth, although "quite thin," was sufficient to show adverse employment action for purposes of summary judgment). Plaintiff's "working conditions" were tangibly and adversely affected when Defendant removed her

supervisory roles. This is an objectively clear demotion, rather than a simple shift in duties.

Defendant cites to a collection of cases delineating the difference between an adverse and merely undesirable employment action, accurately concluding that a "bruised ego," a demotion without change in pay, benefits, or prestige, or a reassignment to a more inconvenient job does not constitute adverse employment actions. (Def. Br. 12-13.)  While Defendant's statement of the law is correct, its application to Plaintiff's demotion misses a crucial point; that removing supervisory duties is more than just a lateral assignment of duties, but a direct alteration of Plaintiff's prestige and "privileges of employment." Langley v. Merck & Co., Inc., 186 F. App'x. 258, 260 (3d Cir. 2006) (quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)) (internal quotation marks omitted). Defendant's action constitutes a demotion, even if her title and pay remained the same. Prestige and authority are important components of a job, and removing these responsibilities puts Plaintiff in an objectively worse employment position. The Court finds that Plaintiff has therefore suffered an adverse employment action with regards to the removal of supervisory duties from her role in the Admissions Department, and therefore

in contention with Defendant's argument, satisfies prong three
of the prima facie test.

Defendant also asserts that Plaintiff cannot establish the
second prong of a prima facie case for racial discrimination
because Plaintiff cannot show she was qualified for the job. The
Court agrees. Without dispute, the record supports Defendant's
averment that Plaintiff's supervisory responsibilities were
removed because Plaintiff was insubordinate to her supervisors
during the telephone call, and more significantly, because
Plaintiff had expressed she was overwhelmed enough in the
position to request a stress leave from the union. (See Def. Ex.
E, Ms. McNulla's write-up of the April 27, 2012 telephone
conversation corroborating that Nicole expressed that she needed
"to take a stress leave" from the supervisory position and that
she hung up on McNulla and Thornton); see also Def. Ex. F
(summary of meeting with Plaintiff and supervisors noting that
McNulla informed Plaintiff at the meeting that her supervisory
role was removed because "[Plaintiff] was overwhelmed, could no
longer do the job, and [had gone] to the Union [to take] a
stress leave, therefore to help relieve that stress she no
longer would need to be the Supervisor.")). Plaintiff does not
address Defendant's contention in her Opposition Brief, and
further fails to proffer any evidence that raises a genuine

dispute as to this fact. It is certainly a reasonable response on an employer's part to remove supervisory duties when an employee takes such dramatic action as requesting stress leave. As such, the Court finds that Plaintiff cannot establish the second prong of the prima facie case for race discrimination and therefore her claim cannot proceed.

The Court takes a moment to emphasize that even if Plaintiff had been deemed qualified and able to satisfy the prima facie case, the same facts support a finding that Defendant had a legitimate, non-discriminatory rationale for removing her supervisory duties. Ms. Thornton's perception that Plaintiff was overwhelmed and perceived to be insubordinate (Def. Ex. E.) is a sufficient justification for the demotion, and adequately rebuts any theoretical discriminatory inference created by the demotion. Plaintiff has not presented any admissible evidence to show such a rationale is a pretext for true racial animus. Regardless, Plaintiff has not established the prima facie case for race discrimination. As such, her allegation that the removal of her supervisory duties was a result of racial discrimination will fail and summary judgment will be granted.

### b. *Reassignment to Ward Clerk*

As to the second allegation of racial discrimination and disparate treatment in connection with Plaintiff's alleged "demotion" from External Case Manager ("ECM") to Ward Clerk, Plaintiff has not established that she suffered the requisite adverse employment action. While Plaintiff herself characterizes the reassignment from ECM to Ward Clerk as a "demotion," there is nothing in the record that corroborates this fact. (Complaint ¶ 29; Pl. Opp. 15) Plaintiff's only evidence is her own testimony that she "should have had [her] choice in what job [she] wanted," a view based exclusively on Plaintiff's own belief that the Ward Clerk position was an inferior role. (Pl. Ex. A, D'Ambrosio Dep. 128:21-25.)

While the Court must examine the facts in the light most favorable to Plaintiff, it does not have to treat as fact Plaintiff's self-serving, uncorroborated, vague and inconclusive testimony. See Solomon v. Soc'y of Auto Eng'rs, 41 F. App'x 585, 586 (3d Cir. 2002); Bodison v. Univ. of Med. And Dentistry of N.J., No. 07-2616, 2009 WL 1298502, at *2-3 (D.N.J. May 8 2009) ("The Court does not believe that Plaintiff's uncorroborated statement, particularly in as much as his statements are inconclusive, crosses the sufficiency threshold," to survive summary judgment.); Jones v. Sch. Dist. of Phila., 198 F.3d 403,

414 (3d Cir. 1999)(holding that there was not enough evidence to
support plaintiff's claim of pretext when plaintiff "ma[de]
numerous allegations in his affidavit which he predicate[d] on
nothing more than his beliefs without having actual knowledge of
them."); Swain, 457 F. App'x at 110 (granting summary judgment
denying Plaintiff's discrimination claim because "[Plaintiff]
relie[d] only upon his subjective preference for the K-9
position, which is insufficient to establish an adverse
employment action," [And] "Even if the responsibilities of a K-9
sergeant are "significantly different" than those of a street
crime sergeant, there is no indication that these different
responsibilities are objectively better.")(emphasis added).

    Contrary to Plaintiff's opinion, the record in no way
reflects that Ward Clerk is considered an inferior position and
that the reassignment was therefore an adverse employment
action. Given that there is no evidence of tangible impact on
Plaintiff's employment, that is, her title, pay, benefits, and
terms and conditions of her employment remained the same,
Plaintiff's reassignment to Ward Clerk is nothing more than a
simple intra-company, lateral transfer. "[L]ateral transfer[s]
in and of itself do[ ] not amount to a significant change in
employment status." Swain, 457 F. App'x at 110. While her job
responsibilities may indeed have changed, it was not such a

31

significant shift to put her in an <u>inferior</u> position. Change in
duties alone does not rise to the level of a materially adverse
employment action. <u>Holmes</u>, 2016 WL 3014404, at *8 (citing <u>Canale</u>
<u>v. State</u>, No. A00104-12T2, 2013 WL 3762470 at *9 (N.J. Super.
Ct. App. Div. 2013) ("A transfer involving no reduction in pay
and no more than a minor change in working conditions will not
do . . . ")). In the instant case, Plaintiff has provided
nothing to support her contention that being reassigned to the
Ward Clerk position is in fact a demotion to an inferior job and
has therefore failed to present sufficient evidence to show she
suffered an adverse employment action.

Additionally, the record does not reveal any evidence from
which a reasonable jury could find that Defendant's decision to
reassign Plaintiff to Ward Clerk was actually tied to her race.
When asked what "facts or evidence do you have that would
suggest your race played a role?" Plaintiff can only respond
with further self-serving conclusory statements backed up by no
circumstantial or direct evidence in the record. (<u>See e.g.</u>, Pl.
Ex. A, D'Ambrosio Dep. 129:1-15 ("I should have had the option;"
"I had more qualifications.")

Again, even if Plaintiff could establish a prima facie
case, summary judgment is still appropriate because she is
unable to present evidence to show that a reasonable jury could

believe Defendant's legitimate, non-discriminatory rationale for
reassigning Plaintiff to Ward Clerk is pretext for racially
motivated discrimination. The record reflects that Plaintiff was
reassigned because she no longer was qualified for the ECM job
after Defendant decided the position needed a more clinical
person in the role. Plaintiff herself admits that Defendant was
bound by Department of Health requirements that mandated a
certain number of people in certain positions. (Pl. Ex. A,
D'Ambrosio Dep. 127:6-128:2.) Given that Ward Clerk was a
mandatory staffing position that was vacant when Plaintiff
returned from leave, it is certainly reasonable for Defendant to
select Plaintiff for that position, especially given Plaintiff's
relevant experience as a nurse's aide. (Id. at 88:25-89:11;
128:3-11.) Moreover, as Plaintiff herself recognizes, there was
a hiring freeze at the time she returned from leave and
Defendant was therefore required to fill vacant positions with
only current employees. (Id. at 165:3-14.) Plaintiff tries to
rebut such justification by pointing to the fact that she is
black and states that "because [she was] Senior Clerk Typist,
she should have had her choice in what job [she] wanted." Such a
hollow attempt to undermine Defendant's legitimate business need
for its employment decision is based in no factual support and

there is no reasonable inference that Defendant's stated reasons are implausible or otherwise pretextual.

Given that Plaintiff cannot pass the threshold requirement for a discrimination claim, and alternatively that Defendant has presented a legitimate business decision which Plaintiff cannot show is unworthy of credence, summary judgment will be granted as to the allegation that she was racially discriminated against when she was reassigned to the Ward Clerk position.

### c. Denial of Scheduling Coordinator and Financial Director positions

Plaintiff's claim that Defendant discriminated against her on the basis of her race when Defendant promoted Ms. Shelton for the Scheduling Clerk position and Ms. O'Brien for the Financial Director position cannot withstand summary judgment because Defendant has asserted a legitimate, nondiscriminatory rationale, namely, that Shelton and O'Brien were rightly perceived to be more qualified for their respective positions. Plaintiff tries to assert she was the better qualified candidate and therefore Defendant's rationale must be pretext for race discrimination. Unfortunately, Plaintiff has again provided the Court with no factual evidence to rebut the myriad of facts in support of Defendant's contention that Plaintiff was not the best candidate for either position. "To discredit the employer's proffered reason the plaintiff cannot simply show that the

34

employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d at 765-76 (3d Cir. 1994) (citing Ezold v. Wolf, Block Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).

With regards to the Scheduling Clerk position, Plaintiff presents no evidence that she was more qualified other than the fact that she had previously held the position. Taking the facts in the light most favorable to Plaintiff, the Court acknowledges that Shelton previously worked in food service, which required only manual labor while Plaintiff had prior clerical experience and an undergraduate degree. (Pl. SOF ¶ 144-45) But to argue this alone makes Plaintiff better qualified belies the facts at hand. First, Plaintiff admits that her prior clerical experience as the Admission Director did not actually involve scheduling of staff. (Pl. Ex. A, D'Ambrosio Dep. 79:19-23.) While Plaintiff did have a couple of months filling in as scheduler back in 2002 (SMF ¶ 84), at the time the Scheduling Position was opened, Shelton had been currently working as a scheduler for the past three months while another scheduler was on leave. (Def. Ex. G, Drackett Dep. 12:12-19; 14:22-15:4.) It was Ms. Shelton who indeed had more scheduling experience, and more knowledge of the

present demands of the job. Moreover, the job qualifications did not demand an advanced degree, only that the individual have "basic computer skills, work well with others, be organized and be able to multi-task and work in a fast paced atmosphere." (Def. Exs. K, L, M.) Given that Plaintiff's prior clerical experience in the Admissions Department resulted in the removal of her supervisory duties and her request for a "stress leave" (Def. Ex. E), Plaintiff is hard-pressed to assert she was better qualified for the scheudling job than Shelton. Moreover, it is not disputed that Shelton was successfully and currently performing in the very position, a fact Plaintiff herself acknowledges. (Pl. Ex. A, D'Ambrosio Dep. 72:11-73:22.) An examination of Drackett's memo on why she chose Shelton over Plaintiff for the job corroborates this fact, noting, "I am very much aware of how easily Ms. D'Ambrosio became stressed. I worked along with her when she was in Admissions Dept . . . My assessment of her at that time was that she was unsure of herself." (Def. Ex. M.) Given that the job was considered one of the most difficult and taxing positions, it is certainly reasonable that Defendant would forego a candidate such as Plaintiff who had already exhibited signs of being overwhelmed. (SMF ¶ 41, D'Ambrosio Dep. 12:19-23.)

As to the Financial Director position, it is likewise clear that Plaintiff was not more qualified than Ms. O'Brien. In fact, Plaintiff likely was not qualified for the position at all. The only support Plaintiff musters is that O'Brien did not hold a degree and that "[O'Brien's] personality is horrible." (D'Ambriosio Dep. 123:16-25.) Plaintiff herself does not hold any degree in finance, has never worked in the financial accounting field, has no knowledge of what a general ledger is, and never prepared a professional balance sheet. (<u>Id.</u> at 140:11-141:10.) Moreover, Plaintiff concedes that she knows nothing about O'Brien's skills, background, qualifications, yet still makes sweeping conclusions about how she was better qualified for the job because she earned her Master's degree online. (<u>Id.</u> at 123:17-24; 124:9-12.) Plaintiff later contradicts herself in her deposition, admitting that she did not yet have the Master's when she applied for the finance position. (<u>Id.</u> at 128:24-142:12.) The only evidence Plaintiff posits to rebut Defendant's justification for hiring Ms. O'Brien, is her own insistence that her subsequent receipt of an online Master's degree somehow entitles her to more money. (<u>Id.</u>) Regardless, such illogical testimony as the only supporting evidence further convinces the Court that Defendant has asserted a legitimate, nondiscriminatory rationale for foregoing Plaintiff for the

finance position. In other words, where Plaintiff adduces no evidence regarding Ms. O'Brien's skills, qualifications, and performance, no reasonable factfinder could find that Plaintiff's qualifications for the finance position were superior.

Even if the Court were to assume Plaintiff was more qualified, such a fact alone does not suggest or imply that she was treated differently <u>because of her race</u>. Plaintiff simply cannot establish the requisite causal connection between her race and the choice of Ms. O'Brien for the finance position. <u>See</u> <u>Holmes</u>, 2016 WL 3014404, at *8 (denying Plaintiff's claim because "he cannot establish an adverse employment action or a link between the protected characteristic or activity and the adverse action.") As shown above, Plaintiff's claims are grounded in unsupported, self-serving allegations. (<u>See</u> D'Ambrosio Dep. 93:12-18) (Plaintiff testifies that everything she perceived to be bad at her employment occurred because of her race.) Even at the summary judgment stage, this is not enough.

The Court is persuaded that Defendant has posited a legitimate, non-discriminatory rationale. Since Plaintiff cannot present any evidence that might persuade a reasonable jury that Defendant's rationale is merely pretext and that its employment

38

decisions were actually based on race, summary judgment will be granted as to this claim.

### d. Claims of Retaliation

Plaintiff argues Defendant's decisions to deny her both the Scheduling Coordinator and Financial Director positions in January 2013, were made in retaliation for filing the initial Charge 842 in December 2012. Defendant responds that Plaintiff cannot establish the prima facie case for retaliation because she cannot show that but for her filing of her discrimination charge, she would have received either position. And regardless, Defendant had a legitimate justification for hiring Ms. Shelton and Ms. O'Brien—simply, they were each better candidates than Plaintiff for the positions.

Title VII prohibits an employer from discriminating against an employee "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . . " 42 U.S.C. § 2000e-3(a). To establish that an unfavorable job action is based upon an illegal retaliatory motive in violation of Title VII, a plaintiff must first establish a prima facie case of retaliation. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). To establish her prima facie case of retaliatory action, Plaintiff must show that (1) she was engaged in protected activity; (2) she was subject to a

materially adverse employment action subsequent to or contemporaneously with such activity; and (3) there is a casual link between the protected activity and the subsequent adverse job action. Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006); Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997); Barber v. CSX Distrib. Servs., 68 F.3d 694, 701 (3d Cir. 1995). "The plaintiff's ultimate burden in a retaliation case is to convince the factfinder that retaliatory intent had a determinative effect on the employer's decision." Cortes v. Univ. of Med. and Dentistry of N.J., 391 F. Supp. 2d 298, 312 (D.N.J. 2005).

Plaintiff has not produced any evidence from which a jury could reasonably conclude that the third element of the prima facie case for retaliation has been met. Under the third element, a plaintiff need not prove that retaliation was the sole reason for an employer's adverse action, but she must show that the action would not have been taken but for the plaintiff's protected activity. Moore, 461 F.3d at 342 (citing LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n, 503 F.3d 217, 232 n. 8 (3d Cir. 2007); see also Watson v. SEPTA, 207 F.3d 207, 215 (3d Cir. 2000)). The only evidence suggesting retaliation is the fact that Plaintiff was not selected for the Scheduling and Finance positions two weeks after Defendant received the EEOC's

40

Notice of Charge of Discrimination. (Def. Ex. N, Pl. Ex. D at
Ex. P-7.) It is unclear whether Ms. Drackett, the decision-maker
as to the Scheduling position was even aware of the EEOC charge
at the time she made her hiring decision in January 2013. (See
Pl. Ex. B, Drackett Dep. 27:2-14.) Ms. Drackett stated that she
learned about Charge 842 sometime between April and October
2015, but Plaintiff points out that Ms. Drackett is not entirely
sure and seems to confuse her answer. (Pl. Ex. B, Drackett Dep.
26; Pl. SOF ¶ 58.) While this may indeed be a genuine dispute
between the parties, it is not material, as a temporal
connection alone is insufficient to establish causation. "The
mere fact that [an adverse action] occurs subsequent to the
lodging of a complaint is ordinarily insufficient to satisfy the
plaintiff's burden of demonstrating a causal link between the
two events." Chambers v. Heidelberg USA, Inc., No. 04-583, 2006
WL 1281308, at *11 (D.N.J. May 5, 2006). There is no additional
evidence—direct or circumstantial—to support this claim. As
mentioned in the preceding discussion, the decision to select
Ms. Shelton and Ms. O'Brien for their respective positions in
scheduling and finance was justified by the legitimate rationale
that Plaintiff was not the best candidate for the job. It is a
far stretch for Plaintiff to argue that but for her EEOC charge,
she would have been selected for the positions when she herself

did not meet the job requirements or qualifications. There is simply no factual support in the record to support a causal link between Defendant's alleged retaliatory animus and the adverse employment action in denying Plaintiff the Scheduling and Finance positions. A merely temporal relationship, that these non-selections occurred subsequent to Plaintiff's filing of an EEOC complaint, absent other evidence, does not suffice to establish a prima facie case for retaliation. Summary judgment will be granted on this claim.

### C. Count II: 42 U.S.C. §1981

Count II of Plaintiff's complaint will be dismissed because her § 1981 claim has no viable legal basis as there is no private right of action under 41 U.S.C. § 1981 for violations by a state actor. McGovern v. City of Philadelphia, 554 F.3d 114 (3d Cir. 2009)(holding that "because Congress neither explicitly created a remedy against state actors under § 1981, nor expressed its intent to overrule Jett, the express cause of action for damages created by §1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units."); Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 731, 733 (1989) (§ 1981 does not itself provide a remedy against state actors); see also Campbell v. Supreme Court of N.J., No. 11-555, 2012 WL 1033308 (D.N.J. Mar. 27, 2012). Given that Defendant as a unit of Camden

County is a state actor, the exclusive remedy is § 1983. Ford v. Se. Pa. Transp. Auth., 374 F. App'x 325, 326 (3d Cir. 2010) (citing McGovern, 554 F.3d at 121). Accordingly, the Court is compelled by Jett and McGovern to conclude that Plaintiff's complaint under § 1981 is legally infirm.

The Court will not grant Plaintiff's leave to amend because the claim is not merely factually insufficient, but legally infirm. Any amendment would be futile because Defendant is a state actor, and a § 1981 claim cannot provide the vehicle for relief. See Harrison Beverage Co. v. Dribeck Importers, Inc., 133 F.R.D. 463, 468 (D.N.J. 1990) (citing 6 Wright, Miller, & Kane, Federal Practice & Procedure § 1487 at 637-642 (2d ed. 1990)) ("If the proposed amendment is "frivolous or advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend."). Count II of Plaintiff's complaint is hereby dismissed with prejudice.

### D. Count III: 42 U.S.C. §1983

Count III of Plaintiff's Complaint alleges Defendant violated her Equal Protection rights under 42 U.S.C. § 1983 for intentionally discriminating against Plaintiff on the basis of her race and for maintaining an illegal municipal custom and policy that facilitated the disparate treatment she experienced when she was reassigned to Ward Clerk and denied positions in

scheduling and finance. (Complaint ¶ 53-55.) Defendant persuasively argues that Plaintiff has failed to identify any policy or custom of Defendant that amounted to a deliberate indifference to Plaintiff's rights. The Court agrees with Defendant and has articulated its reasoning below for granting summary judgment on this claim.

Section 1983 provides that "Every person who, under color of [state law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." In order to impose liability on a local governmental entity for failing to preserve a plaintiff's constitutional rights, a plaintiff bringing a § 1983 claim must show that (1) she possessed a constitutional right of which she was deprived; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy was the moving force behind the constitutional violation. Vargas v. City of Phila., 783 F.3d 962, 974 (3d Cir. 2015) (internal quotation marks omitted); see also A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (A municipality or policymaker defendant will not be held liable unless the defendant "with deliberate indifference to the

consequences, established and maintained a policy or custom which directly caused [the] constitutional harm.") (internal quotations and citation omitted); Mulholland v. Gov't Cty. Of Berks. Pa., 706 F.3d 227, 237 (3d Cir. 2013) (stating that a municipality "'can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom.'" (quoting Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996))). Plaintiff cannot sustain her § 1983 claim against Defendant because no reasonable jury could find that Defendant had a policy or custom that facilitated a constitutional violation against her.

Plaintiff has failed to raise a genuine issue of material fact as to whether CHNRC or the County of Cape May had a policy that amounted to deliberate indifference of her rights, as required to impose liability on Defendant. To the contrary, Defendant had anti-discrimination and anti-retaliation policies in place. (See Def. Ex. T, County of Cape May Equal Employment and Opportunity Policy.) "Policy is made when a 'decision maker possessing final authority to establish municipal policy with respect to the action, issues an official proclamation, policy, or edict." Geissler v. City of Atl. City, No. 16-792, 2016 WL 4071949, at * 4 (D.N.J. July 28, 2016). In civil rights actions, municipalities and government officials are not liable for the

unconstitutional conduct of employees under the doctrine of
respondeat superior. Macklin v. Cty. of Camden, 15-7641, 2016 WL
3545520, at *5 (D.N.J. June 28, 2016); see also Rode v.
Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant
in a civil rights action must have personal involvement in the
alleged wrongs; liability cannot be predicated solely on the
operation of respondeat superior.") While it is true that an
unconstitutional "custom" can be established even if it has not
received formal approval through the body's official decision
making channels, see Monell v. Dep't of Social Servs. of City of
N.Y., 436 U.S. 658, 590 (1978), in such a case the
unconstitutional practices must be "so permanent and well
settled as to constitute a 'custom or usage' with the force of
law." Id. at 691 (citing Adickes v. S.H. Kress & Co., 398 U.S.
144, 167-168 (1970). In an attempt to address this clear legal
principle, Plaintiff tries to equate Ms. Drackett's and Ms.
Thornton's hiring authority with the authority to create
official employment policies for the entirety of CHNRC. (Pl.
Opp. 33.)  Plaintiff in her Opposition points to "ample
evidence" that Ms. Drackett and Ms. Thornton possessed final
policy-making authority. (Pl. Opp. 33.) Yet she fails to direct
the Court to any particular factual allegations about a specific
custom or policy or even rule, instituted by either Drackett or

46

Thornton that would have fostered discriminatory action. (Pl. Opp. 33.)  Consequently, Plaintiff falls short of alleging grounds necessary to sustain a municipal liability claim, and thus her claims under § 1983 will fail.

### E. Count IV: New Jersey Law Against Discrimination

Defendant asserts that the NJLAD's two-year statute of limitations bars Plaintiff's claims relating to conduct that took place prior to October 22, 2012, because Plaintiff did not file her complaint until October 22, 2014. "In employment discrimination acts, the limitations period begins with the 'time of the discriminatory act.'" Hanani v. N.J. Dep't of Envtl. Prot., 205 F. App'x 71, 76 (3d Cir. 2006) (quoting Miller v. Beneficial Mgmt. Corp., 977 F.2d 834, 842 (3d Cir. 1992)). Plaintiff does not dispute this fact and incorporates into Count IV of her complaint only allegations of NJLAD violations as to "conduct that occurred in the year 2013." (Compl. ¶ 17.) Therefore, only Defendant's following "discrete acts" are relevant to Plaintiff's NJLAD allegations of discrimination and retaliation: (i) reassignment of Plaintiff to Ward Clerk after her return from FMLA leave in December 2012; (ii) rejection of Plaintiff for the Scheduling Coordinator position in January 2013; and (iii) rejection of Plaintiff for the Finance Director position in January 2013. See Illas v. Gloucester County

47

Sherrif's Dept., No. 14-4061, 2015 WL 778806, at *5 (D.N.J. Feb. 24, 2015) (explaining that "'discrete acts' are easy to identify as discriminatory, such as termination, failure to promote, denial of transfer, or refusal to hire."). We turn to address the merits of these remaining NJLAD claims.

Discrimination and retaliation claims under the NJLAD are analyzed according to the same McDonnell Douglas burden-shifting framework applied to Title VII claims. Campbell v. Supreme Court of New Jersey, No. 11-555, 2012 WL 1033308, at *17 (D.N.J. Mar. 27, 2012) (citing Davis v. City of Newark, 285 F. App'x 899, 903 (3d Cir. 2008); see also Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 493 (3d Cir. 1999) ("Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim."). Plaintiff's claims with regards to these remaining NJLAD allegations will be dismissed because she cannot establish a prima facie case of discrimination or retaliation under the NJLAD, and alternatively because Defendant has asserted a legitimate non-discriminatory rationale for each of the discrete acts, none of which has Plaintiff rebutted with evidence giving rise to a genuine dispute of material fact. Thus the Court refers to the reasons set forth in its substantive analysis of Plaintiff's Title VII claims to grant summary judgment on each of Plaintiff's NJLAD claims.

**F. Count V: NJCRA (New Jersey Civil Rights Act)**

In her reply to Defendant's Motion for Summary Judgment, Plaintiff seeks a voluntary withdrawal of her NJCRA claim pursuant to Fed. R. Civ. P. 41 (a)(2). The Court grants the withdrawal and therefore will not delve into a substantive analysis of this claim.

**G. Count VI: Family and Medical Leave Act**

Plaintiff alleges she was unlawfully "demoted" from Ward Clerk upon return from FMLA leave, constituting (1) interference and (2) retaliation under the FMLA. Defendant moves for summary judgment on both claims. For the reasons set forth in the foregoing section, Defendant's motion will be granted in full. An employer may be sued under the FMLA for interfering with an employee's FMLA rights, as well as retaliating against an employee who exercises rights under the FMLA. Lupyan v. Corinthian Colleges In., 761 F.3d 314, 317 (3d Cir. 2014). "[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009); see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 312 (3d Cir. 2012). The Court will address each claim in turn.

1. *Interference*

The Court finds that there is no genuine dispute as to whether Plaintiff would have been reassigned as part of Defendant's restructuring plan, even if she had not gone out on FMLA leave. Thus, she cannot prevail on her interference claim under the FMLA.  29 U.S.C. § 2615(a)(1) of the FMLA prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right" that it guarantees. See Morro v. DGMB Casino LLC, 112 F. Supp. 3d 260, 279 (D.N.J. 2015).  The Act permits the employer to deny reinstatement if the employee would have lost her job if she had been working during the period of her leave. Parker, 324 F. Supp. 2d at 485-86 (citing Taylor v. Union Inst., 30 F. App'x 443, 452 (6th Cir. 2002) ("An employee is not protected from an adverse employment decision that would have occurred even if she had not taken leave because "[t]he FMLA does not give the employee on protected leave a bumping right over employees not on leave."). The FMLA states that "[n]othing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken leave." § 2614(a)(3)(B).

50

Regardless of her medical leave, Plaintiff would have been reassigned since she no longer fit the job qualifications for the ECM position after Defendant required an LPN for the job.

Prior to her even going on leave, Plaintiff already knew her supervisors Ms. Thornton and Ms. McNulla had posted a job opening for her current ECM position. (See D'Ambrosio Dep. 148:3-12.) Plaintiff readily admits that she knew "[Defendant] wanted a more clinical person to resume the job duties of External Case Manager." (Id. at 148:23-25.) By modifying the job qualifications, Defendant effectively eliminated the job Plaintiff held before her FMLA leave. Therefore, Plaintiff could not have resumed that position when she returned from leave, since the ECM position as she had formerly occupied it was no longer available. Furthermore, and quite significantly, Plaintiff was not even officially working as an ECM. While she claims she was still "acting as External Case Manager," she "was actually Admissions Clerk." (D'Ambrosio Dep., 87:15-20)(emphasis added).

Plaintiff further alleges that Defendant denied benefits she was entitled to under the FMLA by reassigning her to Ward Clerk in September 2012, which she argues is not an "equivalent position" to her former role as ECM. (Pl. Opp. 37.) It is true that upon return from qualified leave, an employee is entitled

51

under the FMLA to return to her former position, or to an equivalent one. Conoshenti v. Pub. Serv. Elec. & Gas. Co., 364 F.3d 135, 141 (3d Cir. 2004). However, "this entitlement to restoration is a qualified one." Morro, 112 F. Supp. 3d at 281; see also Parker v. Hanhemann Univ. Hosp., 234 F. Supp. 2d 478, 485 (D.N.J. 2002) ("[T]he FMLA does not absolutely protect an employee's reinstatement."). Regardless, the Ward Clerk position is an equivalent position within the meaning of the FMLA. As discussed above in the substantive analysis of her Title VII claims, supra Section II(B)(1)(b), the Ward clerk position was not a demotion, but simply a lateral transfer. In describing an employee's entitlement upon return, the FMLA states " . . . an employee is entitled to be returned to the same position . . . or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment." 29 C.F.R. § 825.14. (emphasis added). Upon reassignment, Plaintiff still maintained her Civil Service Title of Senior Clerk Typist with the same pay and benefits. (D'Ambrosio Dep. 88:7-22; 115:12-23; 181:1-22.) For the same reasons Plaintiff's reassignment to Ward Clerk did not constitute an alteration in Plaintiff's terms and conditions of employment under Title VII, there was no alteration under the FMLA definition.

Comparison of Plaintiff's own descriptions of her responsibilities in the two jobs is revealing. In describing the role of Admissions clerk, Plaintiff's actual position before she went on FMLA leave, she stated an Admissions Clerk "would face sheets, [meaning work the] papers signed with residents when new residents would come into the facility . . . [take] phone calls from hospitals, check referrals . . . check insurances, verification." (D'Ambrosio Dep. 91:6-15.) As Ward Clerk, Plaintiff explains her duties as "a lot of assistance with residents . . . answering call lights, making sure doors, alarms don't go off . . . filing paperwork, making sure residents' charts are organized." (Id. at 89:1-11.) While the responsibilities may not be exactly identical, the overlap in patient interaction and clerical work demonstrates that the two positions are sufficiently similar to constitute "equivalent positions" within the meaning of the FMLA, and that no reasonable factfinder could conclude that they were not.

Therefore, this Court will grant Defendant's motion for summary judgment on Plaintiff's interference claim because no questions of material fact remain about whether Plaintiff was offered an equivalent position upon her return from FMLA leave, nor whether Plaintiff's role as ECM would not have remained available to her even if she had not taken FMLA leave.

53

2. *Retaliation*

Summary Judgment is further warranted in Defendant's favor on Plaintiff's claim of FMLA retaliation because Defendant has proffered a legitimate, non-retaliatory reason for Plaintiff's reassignment to Ward Clerk, as well as for its decisions to deny Plaintiff the Scheduling and Finance Positions.

Since FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. Lichtenstein, 691 F.3d at 302. "Accordingly, claims [of FMLA retaliation] based on circumstantial evidence have been assessed under the burden shifting framework established in McDonnell Douglas." Id.; see also Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 315 (6th Cir. 2001); O'Connor v. PCA Family Health Plan Inc., 200 F.3d 1349, 1353 (11th Cir. 2000)(applying burden-shifting FMLA retaliation claim as is "common to employment discrimination claims"); Hodgens v. General Dynamics Corp., 144 F.3d 151, 160 (5th Cir. 1998) (applying McDonnell Douglas to FMLA retaliation claim because it deals with "tricky issues" present in discrimination claims); Morgan v. Hilti Inc., 108 F.3d 1319, 1325 (10th Cir. 1997). Unlike in an interference claim, in regards to FMLA retaliation claims defendants can justify their actions by establishing a legitimate business

purpose for its decision. Parker, 234 F. Supp. 2d at 492. As analyzed in the preceding Title VII discussion, the Court finds there is no material factual dispute as to the credence of Defendant's proffered justifications for its employment decisions to deny her these positions—namely, that Plaintiff's lack of qualifications made her unsuitable for the scheduling and finance positions, and Defendant's business need demanded reassigning Plaintiff to Ward Clerk. Because Plaintiff has not met her burden of coming forth with admissible evidence tending to show Defendant's proffered explanation is not credible, the Court will grant summary judgment and dismiss Plaintiff's claim of retaliation under the FMLA.

### H. Count VII: New Jersey Family Leave Act

Courts apply the same FMLA standards and framework when evaluating claims under the New Jersey Family Leave Act ("NJFLA"). Wolpert v. Abbott Laboratories, 817 F. Supp. 2d 424, 437 (D.N.J. 2011); Santosuosso v. Novacare Rehabilitation, 462 F. Supp. 2d 590, 596 (D.N.J. 2006). As such, for the same reasons as explained in the previous section, Plaintiff cannot survive summary judgment on her claims under the NJFLA and summary judgment is granted as to Count VII.

**V. CONCLUSION**

  For the foregoing reasons, Defendant's motion for summary judgment is granted in full. Plaintiff's claims are hereby dismissed. An appropriate Order follows.


 **September 21, 2016**      **_s/ Jerome B. Simandle**
Date            JEROME B. SIMANDLE
               Chief U.S. District Judge